Sam Meziani (#9821)
Seamus W. Appel (#17783)
GOEBEL ANDERSON PC
405 South Main Street, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 441-9393
smeziani@gapclaw.com
sappel@gapclaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **AARON JAMES, TIFFANY JAMES, GABRIEL PECORARO, and RAVEN JAMES,**<br><br>    Plaintiffs,<br><br>v.<br><br>**EARNEST ROBERT RUSSO; DAN BARTLETT; JAMIE CROFT; CHRIS MCHUGH; KELLY TAYLOR; AUSTIN STIRLAND; TREY BRIMHALL; BRYAN GRIFFITH; CITY OF COTTONWOOD HEIGHTS; TIM TINGEY; CO-CONSPIRATORS I-V; and JOHN DOES I-X,**<br><br>    Defendants. | **AMENDED COMPLAINT AND JURY DEMAND**<br><br><br>Civil No. 2:21-cv-00287-HCN<br><br>Judge Howard C. Nielson, Jr. |

## INTRODUCTION

In August of 2020, the James family was grieving. Their cherished son and brother Zane James was dead, shot by a Cottonwood Heights police officer in the back on May 29, 2018. Nothing could bring back Zane, but the James family was not willing to accept Zane's death as simply another meaningless death by a police officer that was too eager and too quick to take life.

Aaron and Tiffany James legitimately asked why an officer felt compelled to use deadly force when it was not required and what legal regime could authorize an officer to shoot a young man in the back without consequence. In their search for answers, Aaron and Tiffany did what American citizens are supposed to do. They petitioned their Government. They spoke to legislators. They spoke to City Council members. They spoke to the District Attorney. So that Zane's death would not be meaningless, the James family hoped to achieve some sort of legislative, policy or cultural reform on the issue of police shootings.

In August of 2020, the James family—Aaron James, Tiffany James, Raven James and Gabe Pecoraro—did what Americans have done since 1773, they joined a protest. The protest was peaceful. Aaron and Gabe did not carry weapons and did not call for violence. There was no damage to property. The protestors met in their own neighborhood among their own friends, neighbors and homes to publicly grieve and express their deep frustration with the City of Cottonwood Heights and the Police Department's inaction in creating policy change after Zane's shooting. The protestors planned to march to the site where Zane was shot, but they never reached their destination.

Defendants were not going to let the James family or other citizens protest the actions of their own officer in shooting Zane and they were not going to allow citizens the opportunity to assemble in the streets to protest police misconduct. Russo and Bartlett, disregarding the fact the public street is a public forum, ignoring the protestors' First Amendment rights, and to retaliate against the exercise of protected speech they deemed offensive, all under the direction of and with the knowledge and approval of Tingey and Co-Conspirators 1-5, ordered the protestors to disband and exit the street.

Russo and Bartlett claimed that this order was necessary due to traffic concerns. This excuse, however, was pretextual and designed to suppress speech. The protest started in the late and quiet Sunday afternoon. There was no traffic. On top of this, officers lined up multiple vehicles behind the march to prevent any cars from approaching the marchers. As a result, there was zero traffic around the protestors.

Using "traffic" concerns as a pretext and in violation of the First Amendment, Russo and Bartlett gave orders to arrest all persons in the street.

Although they targeted the James family, the Cottonwood Heights Police Department has an established policy, practice and custom of not arresting those citizens that walk in the streets and who are not protesting the actions of the Police Department. Moreover, Defendants did not arrest protestors advocating a Manichean pro-police message who were also walking in the street. For example, one of the counter-protestors—while standing in the street in full view of officers— threatened to kill members of the James family by burning down their house. Although this counter-protestor threatened a violent felony in full view of law enforcement, officers thought it was funny and failed to arrest the man— solely because they deemed his fighting words acceptable.

On August 2, 2020, Gabe was walking on the sidewalk and street in his own neighborhood exercising his First Amendment rights when he was targeted and assaulted from behind by Officer Croft. Croft knew Gabe as Zane's brother. Croft singled out and targeted Gabe to retaliate against the James family for speaking out about Zane's death. Instead of trying to make a peaceful arrest, Officer Croft grabbed Gabe by the head and neck. Gabe reacted instinctively and failed to submit to this unlawful assault. This made Officer Croft seethe with anger. When Officer Croft saw Gabe minutes later, he enlisted another officer to rush and attack Gabe. As a result of this assault,

Gabe suffered a concussion, broken nose, damage to his esophagus, numerous deep abrasions and taser burns, and other injuries such as severe depression, anxiety and post traumatic stress.

Aaron James, was understandably alarmed seeing his son being attacked and approached officers to obtain an explanation. Aaron was also singled out and targeted. Officers did not kindly ask him to move away from the melee. Officers did not assure Aaron they would treat Gabe with respect and that no harm would come to him. When officers saw Zane's father speak against the actions of their comrade, officers seized upon the chance to give Aaron a beating as well. Aaron was brutally assaulted by officers without basis. Aaron suffered numerous deep contusions from being beaten with a baton and tasered and has also suffered severe depression, anxiety, and post traumatic stress.

No citizen should be beaten for speaking peacefully. But worse than the physical harm, is the psychological trauma that results from being victimized for a second time. With wounds still fresh from the murder of Zane, the James family hoped to find some degree of solace by advocating for policy change. Perhaps through speaking out the James family could make a difference. On August 2 their hope for change was brutally crushed by small-minded policy makers and officers who decided that peaceful expression should be smashed to erase the words of a grieving family.

## **PARTIES**

1.  Plaintiff Aaron James ("Aaron") is a citizen of the United States and a resident of Salt Lake County, State of Utah.

2.  Plaintiff Tiffany James ("Tiffany") is a citizen of the United States and a resident of Salt Lake County, State of Utah. Tiffany James asserts all claims herein except unlawful arrest and excessive force.

3.      Plaintiff Raven James ("Raven") is a citizen of the United States and a resident of Salt Lake County, State of Utah.   Raven James asserts all claims herein except unlawful arrest and excessive force.

4.      Plaintiff Gabriel John Pecoraro ("Gabe") is a citizen of the United States and a resident of Salt Lake County, State of Utah.  Gabe is the son of Tiffany and Aaron James.

5.      At all relevant times, Defendant Earnest Robert Russo ("Russo") was the Chief of Police of the Cottonwood Heights Police Department ("CHPD"), which is a department of the City of Cottonwood Heights. Russo is an employee of the City of Cottonwood Heights.   These are photographs of Russo taken August 2, 2020:



6.      At all relevant times, Defendant Dan Bartlett was a Lieutenant with the CHPD. These are photographs of Bartlett taken on August 2, 2020:



7.      At all relevant times, Defendant Jamie Croft was a police officer with the CHPD.

These photographs of Officer Croft (wearing black) were taken August 2, 2020:





8.     At all relevant times, Defendant Chris McHugh was a police officer with the

CHPD.  Officer McHugh wore a generic green jumpsuit without a badge or other identifying

information. These are photographs of Officer McHugh taken on August 2, 2020:

 



     9.     At all relevant times, Defendant Kelly Taylor was a police officer with the CHPD.

This is a photograph of Officer Taylor on August 2, 2020:



10.     At all relevant times, Defendant Austin Stirland was a police officer with the Unified Police Department.   Upon information and belief, Officer Stirland was called from a different jurisdiction by one or more co-defendants for unknown reasons.   He arrived with a military helmet anticipating aggressive physical action.   These are photographs of Officer Stirland taken August 2, 2020:



11.     At all relevant times, Defendant Trey Brimhall was a police officer with the CHPD.

These are photographs of Officer Brimhall taken on August 2, 2020:



12.     At all relevant times, Defendant Bryan Griffith was a police officer with the CHPD.

13.     Tim Tingey is the City Manager for the City of Cottonwood Heights.

14.     Unknown Co-Conspirators 1-5 are those policy making officials of the City of Cottonwood Heights that approved of the plan and order to interrupt the protest based on the content of the protected speech; to prevent protestors from walking in the public street; and to arrest protestors in the public street.  The Co-Conspirators are sued in their individual and official capacities.

15.     At all times alleged in this Complaint, the Defendants were acting within the course and scope of their employment and under color of state law.

16.     Defendant City of Cottonwood Heights is a political subdivision of the State of Utah and a body corporate and politic.  The City of Cottonwood Heights is responsible for implementing and enforcing policies, customs and practices to prevent citizens from exercising their First Amendment rights within the City of Cottonwood Heights, and in particular by gathering for the purposes of assembly and free expression in the public streets.

17.     John Does I-X are unknown officers and supervisors that participated in the events set forth in the Complaint.

18.     All officers are sued in their individual capacity.

19.     Tim Tingey is sued in his individual and official capacities.

20.     Chief Russo is sued in his individual and official capacities.

## JURISDICTION AND VENUE

21.     This case arises under the First, Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.  The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

22.     The acts in this complaint happened in Salt Lake County, Utah.  Venue is proper under 28 U.S.C. § 1391.

## ALLEGATIONS

### Shooting of Zane James

23.     Beginning in 2016 the CHPD engaged in a pattern of targeted harassment of Aaron's son, Zane James.

24.     During this harassment, Zane was arrested multiple times for offenses he did not commit, based on false probable cause and fabricated evidence.

25.     In 2017, the CHPD's harassment of Zane intensified and Zane was falsely charged with robbery charges which were later dismissed.

26.     Zane was targeted, harassed, and publically humiliated by officers of the CHPD repeatedly for over two years, until he was eventually shot and killed by Officer Casey Davies of the CHPD on May 29, 2018.

27.     CHPD did not inform the James family their son had been shot until Aaron went to the police station on May 29, 2018 to ask for help finding Zane.

28.     In May of 2019, the Aaron and Tiffany James filed a wrongful death lawsuit against Officer Davies and the City of Cottonwood Heights in United States District Court.  That case is pending.

29.     Aaron and Tiffany began lobbying city and state legislators and the District Attorney to begin policy and law changes following the death of George Floyd and the May 29, 2020 protests in Salt Lake City.

30.     Aaron and Tiffany participated in multiple City Council meetings and activist activities including speaking at protests in Cottonwood Heights and Salt Lake City for police reform.

31.     On August 1, 2020, the James Family held a memorial for Zane's 22nd Birthday at the victims of police violence murals in Salt Lake City.

**August 2, 2020 Protest**

32.     On August 2, 2020, the James family participated in a peaceful protest and memorial march in Zane's honor in cooperation with Salt Lake City activist groups.

33.     The protest took place in the Cottonwood Heights Mill Hollow neighborhood, a block from where the James family lived and about three blocks from where Zane was shot.

34.     This is a photograph of the James family at the protest:



35.     The protest began with speeches discussing voting as a path to police policy and law reform at Mill Hollow Park.

36.     This is a photograph of the protestors at the park and a photograph of a car decorated with posters honoring Zane James:





37.    After the speeches, the protesters began to play music, dance, and march down

Hollow Mill Drive.

38.     At this hour, (around 5:00 p.m. on a Sunday, in this particular neighborhood whose population is comprised predominantly of members of the Church of Jesus Christ of Latter Day Saints who customarily reserve late afternoons for dinner and family time), most residents were home and not traveling through the neighborhood.

39.     The streets around Mill Hollow Park are quiet residential streets, that were especially quiet on a late Sunday afternoon.

40.     The march was peaceful.  The protestors were in good spirits despite the somber message of protesting the Zane James shooting and police misconduct in general.

41.     This is a photograph of marchers at the beginning of the march:



42.     Each member of the James family participated in the march, Aaron, Tiffany, Gabe, and Raven.

43.    Almost immediately after the march began, officers interrupted the march by blockading the protestors with police cars in the front and from behind.

44.    These photographs show the blockades on both ends:







45.    The first blockade is identified as "Police Blockade No. 1" in this map:



46.     The organizers of the march spoke to officers.

47.     Officers told the organizers that the protestors may not be present in the public street.  Officers instructed the organizers that all protestors must walk on the sidewalk.

48.     Organizers explained to officers that the protestors had a right to protest in the street, and engaged in discussion with the officers.

49.     The order that all protestors walk on the sidewalk was surprising and disturbing to the protestors because one of their primary objective was to gather together in a group march; dance and communicate their views on police shootings and police misconduct.  This was a primary and important purpose of the protest.  The organizers had previous experience marching in Salt Lake City, where the police officers did not interfere with marchers' rights to walk together in the streets.

50.     The order forcing the protestors onto the sidewalk substantially interfered with the purpose of the protest and the protestors' protected speech.

51.     Despite this, in an effort to comply with the unlawful order, the organizers of the march instructed all the protestors to walk on the sidewalk.

52.     Most of the protestors walked on the sidewalk:





53.     By 5:25 p.m., the marchers reached 6710 South.

54.     Officers placed a second blockade here "Police Blockade No. 2".  See the map above.

55.     Officers created this blockade by placing police vehicles in front and behind the marchers, as shown by these photographs:





56.     At the second blockade, Russo and Bartlett gave orders that all protestors must exit the street.

57.     Tim Tingey, City Manager, consulted with Russo before the protest and approved of the plan to interrupt the protest based on the content of protected speech.

58.     Upon information and belief, Tingey also approved of the plan to arrest protestors for exercising First Amendment rights.

59.     Russo and Bartlett gave orders to all officers to **arrest** any protester in the street.

60.     Defendants have an established custom and practice of not arresting those citizens that walk in the streets of Cottonwood Heights, and who are not protesting the actions of the police department.

61.     Citizens of Cottonwood Heights regularly walk in the streets in this neighborhood and are not arrested.

21

62.     In addition, as set forth below in paragraphs 195-232, which are incorporated herein, Defendants allowed protestors advocating a pro-police message to walk freely in the streets.

63.     Defendants did not arrest people speaking in the streets who were advocating a simplistic pro-police message, even when one of them, in full view of officers, and with officers' approval, threatened Tiffany and Raven James with a violent felony.

64.     Defendants had a policy, custom and and practice that allowed non-protesting citizens to walk freely in the streets and that excused some citizens' fighting words, thus proving that animus towards Plaintiffs for engaging in protected speech was the basis for the unlawful and retaliatory arrests.

65.     Officers did not have a warrant to arrest Aaron or Gabe.

66.     There was no probable cause to arrest Aaron or Gabe.

67.     Video and audio recordings of the event reveal officers made the following statements:

> "***Everybody in the street is getting arrested right now***" and
>
> "***Everybody that is in the street is going in cuffs***."[1]

68.     Shortly after this order, Croft attacked Gabe.

69.     While Gabe was walking on the street near the sidewalk, Croft attacked Gabe from behind.

70.     Croft said nothing to Gabe before the assault.

71.     Croft did not ask Gabe to step onto the sidewalk.

---

[1] Exhibit A.  (Brimhall body cam) (Dkt. 4)

72.     Croft did not say he was placing Gabe under arrest.

73.     Instead, Croft's purpose was to assault Gabe.

74.     Before the assault, Croft knew Gabe as Zane's brother.

75.     Croft had animus towards Gabe. He was upset Gabe was protesting the shooting of his brother by a Cottonwood Heights officer.

76.     In fact, Croft intitially began marching towards another protestor but turned away from this protestor once he recognized Gabe, because his intent and desire was not to arrest Gabe, but to assault him.



77.     A video showing the attack is submitted as Exhibit B.  (Dkt. 4)

78.     Croft grabbed Gabe by the neck and lower head, under the ear.

79.     Gabe was scared and did not understand why he was attacked.

80.     The two fell to the street.

81.     Brimhall then ran over to assist Officer Croft.

82.     Brimhall was wearing a mask with bloody teeth to impart fear in onlooking citizens.

83.     Brimhall was not wearing a name tag and when asked to identify himself he cowardly told protestors his name was "Officer Stone."

84.     Croft was on top of Gabe and repeatedly forced Gabe's head into the concrete curb, causing injury.

85.     Aaron and other alarmed protestors approached to try to help Gabe and began yelling at the officer to let him go.

86.     Aaron did not understand why officers were assaulting his son.  Aaron feared for his son's life.

87.     Croft ultimately released Gabe and Gabe walked away from this assault.

88.     Some time later, Croft was standing on a driveway near the sidewalk.  He recognized Gabe in the crowd.

89.     Croft, full of animus, anger, and frustration, hatched a plan to assault Gabe again.

90.     Croft enlisted McCugh to assist in the assault.

91.     As Gabe approached Croft and McCugh he was visibly upset and agitated, having been assaulted at a protest for his dead brother who was shot by a Cottonwood Heights officer.

92.     Croft and McCugh sprang into action.

93.     While McCugh distracted Gabe by threatening to hit him with a wooden baton, Croft approached Gabe from behind and, for a second time, grabbed him from behind.

94.     Croft attacked Gabe from behind, bending him over and pulling his shirt over his head.



95.     McHugh hit Gabe with the baton.

96.     Onlookers were horrified by this assault.

97.     Gabe feared for his life.

98.     McHugh repeatedly pepper sprayed Gabe and others in the crowd.

99.     Officer Stirland then tackled Gabe to the ground and caused Gabe's head to strike the concrete.

100.    Brimhall then picked Gabe up and placed a respiratory chokehold on Gabe, restricting Gabe's ability to breathe and impacting his esophagus, while tackling Gabe head first to the ground again.

101.    Stirland then got on top of Gabe and applied a chokehold from behind while punching Gabe from behind on the face and head, breaking his nose.

102.    Russo then approached.  Russo supervised and approved of this excessive use of force and continued to give directions to the armed police officers who were beating a subdued Gabe on the ground.

103.   Officer Kelly Taylor repeatedly tasered Gabe for several seconds while Gabe was restrained by other officers.

104.   Taylor and others failed to warn Gabe before using the taser.

105.   The Tenth Circuit has held the taser weapon is designed to cause "temporary paralysis and excruciating pain."[2]

106.   Gabe was restrained by other officers when Kelly used the taser.

107.   The use of the taser was objectively unreasonable.

108.   Kelly used the taser for the sadistic purpose of causing pain and to punish Gabe for daring to confront CHPD by protesting the shooting of Zane James.

109.   When another protestor expressed disgust with the assault, Officer Kelly ran to the protestor and threatened to tase this protestor as well.

110.   Russo supervised and sanctioned this entire assault.

111.   Bartlett supervised and sanctioned this entire assault.

112.   At this point Aaron approached to try to help his son and understand why the officers were attacking his son.

113.   Aaron then knelt down next to his restrained son to try and comfort him when Russo began applying a chokehold on Aaron.

114.   Aaron was violently beaten, tased, pepper sprayed, and put into multiple chokeholds by the officers despite not provoking them or being told he was under arrest.

115.   Aaron sustained multiple lacerations, taser burns, and tissue damage to the lower back and legs.

---

[2] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010).

116.    Officers failed to warn Aaron before using the taser.

117.    The use of the taser against Aaron was objectively unreasonable.

118.    Aaron was handcuffed behind his back and placed on the ground near other protestors who had been arrested.

119.    During these attacks, Brimhall's body camera fell out of its cradle twice.

120.    The second time Brimhall lost his body camera, while Aaron was being attacked nearby, an unknown officer in blue jeans and a black button down shirt picked up the camera and intentionally covered the lens. Multiple protestors were attacked and handcuffed while this officer stood nearby.  The officer intentionally covered the lens of the body camera in a deliberate and unlawful attempt to destroy evidence of police misconduct.  The unknown officer hid the assaults from public view because he understood officers were acting outside the law.

121.    Gabe was handcuffed and marched by officer Stirland and Chief Russo to a police vehicle without receiving medical attention.  Gabe was bleeding, severely concussed, and suffering from an injured esophagus.

122.    Russo then took Gabe to Russo's white, unmarked SUV, and put Gabe cuffed in the front seat.

123.    Despite needing medical attention, Russo drove Gabe around for approximately half an hour.

124.    During this car ride, Russo lectured and berated Gabe claiming that Gabe caused Zane's death.

125.    Russo told Gabe his family was "trash."

## FIRST CLAIM FOR RELIEF
### *Violation of United States Constitution, Amendment No. 1*
### *42 U.S.C. § 1983*
### *(All Defendants)*

126.    Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

127.    The First Amendment states in relevant part:

> Congress shall make no law…abridging the freedom of
> speech…or the right of the people peaceably to assemble,
> and to petition the Government for a redress of grievances.

128.    The First Amendment is applicable to the State of Utah and officers acting under the color of state law through the Fourteenth Amendment.

129.    Plaintiffs are United States citizens and enjoy the rights recognized, not created, by the First Amendment to the United States Constitution.

130.    The United States Supreme Court has repeatedly referred to public streets as the "*archetype of a traditional public forum*."

131.    The United States Supreme Court has held "*all public streets are held in the public trust and are properly considered traditional public fora*."

132.    The United States Supreme Court has held streets occupy a "*special position in terms of First Amendment protection*" and officers' ability to restrict expressive activity in such public fora is *"very limited*."

133.    The Tenth Circuit has instructed that public streets "*have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions*."

134.    Under Tenth Circuit precedent, a "*complete ban*" on expressive speech in a public forum violates the First Amendment.[3]

135.    Police officers may not interfere with Plaintiff's First Amendment rights to protest and assemble in the streets unless there is a "*clear and present*" danger of riot, imminent violence or other immediate threat to public safety.

136.    Neither energetic, even raucous protestors who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians justify police stopping or interrupting a public protest.[4]

137.    The First Amendment prohibits Defendants from taking retaliatory actions against citizens for engaging in protected speech.

138.    Defendants were on notice that officers may not arrest citizens for engaging in protected speech, and were on notice that they may not institute an all encompassing ban on speech in a public street.

139.    Russo and Bartlett ordered officers to arrest every protestor in the street.

140.    This order was unlawful because the protesters enjoyed the right to protest in the public street.

141.    The order was decidedly not content neutral.

142.    The order was a policy developed by Russo, Tingey, and Co-Conspirators 1-5.

---

[3] *Verlo v. Martinez*, 820 F.3d 1113, 1135 (10th Cir. 2016)
[4] *Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.) citing *Cox v. Louisiana*, 379 U.S. 536, 546-47 (1965) (vacating Jim Crowe protestor's conviction for obstructing a public passage for meeting on the sidewalk across from the courthouse).

143.     Russo and Bartlett issued the order with animus directed towards the protestors and to retaliate against the protestors for engaging in protected speech.  The protesters were protesting police misconduct in general, as well as the unlawful shooting of Zane James in Cottonwood Heights by a Cottonwood Heights officer, one of their own, on May 29, 2018.

144.     The order was intended to target the James family and to retaliate against them for daring to speak about the shooting of Zane and the need for reform.

145.     The order was designed to shut down protected speech because the speech criticized the Cottonwood Heights Police Department for its shooting of Zane James.

146.     Because the protestors were protesting the actions of CHPD, Russo, Bartlett, Tingey, and Co-Conspirators 1-5 interpreted the protest as improper, and decided to take actions to shut it down, even if those actions interfered with Plaintiffs' First Amendment rights.

147.     Russo, Bartlett and the other officers, with approval of Tingey and Co-Conspirators 1-5, claimed there was interference with traffic as a purely pretextual excuse to shut down the protest, shut down protected speech, and retaliate against the protestors for their protected speech.

148.     As shown by body cam video, however, there was absolutely no traffic on this quiet residential street on a Sunday afternoon in Cottonwood Heights, Utah.

149.     Body cam video shows the only cars present were associated with the protest.

150.     The remaining cars shown in the videos were marchers' cars parked on the side of the road.

151.     Protestors did not interrupt traffic.

152.     Body cam video shows that officers created a blockade behind the protestors so that there were Zero cars in the street and Zero traffic.

153.    The alleged need to allow the free flow of traffic was purely a pretextual excuse to shut down speech Defendants deemed offensive.   Defendants' pretextual excuse does not come close to surviving strict scrutiny.

154.    However, even if the order was not content based, which it was, Defendants' order that the protestors must exclusively use the sidewalk does not survive intermediate scrutiny.

155.    This court has held:  "*The Defendants cannot cut off access to this important public forum simply because adequate alternatives for communication exist.  Instead, the Defendants must show that the restrictions they have imposed on State Street are narrowly tailored to serve a significant government interest.  Because they have failed to do so, even the presence of ample alternatives for communication cannot save the offending provisions [of the ordinance].*"[5]

156.    Plaintiffs had an important First Amendment interest in being part of a peaceful gathering on the street as a unified group, rather than being separated from each other by being ordered into a long line on the narrow sidewalk.

157.    This court has recognized "*Street parades afford greater visibility to the marchers than parading down the sidewalk, and may also allow marchers to proceed abreast....*"[6]

158.    Defendants' had a custom, policy, and practice of not arresting those citizens of Cottonwood Heights that walk in the streets and who are not protesting the actions of the Police Department.

---

[5] *iMatter Utah v. Njord*, 980 F. Supp. 2d 1356, 1384 (D. Utah) (Shelby, J.)
[6] *Id.*

159.    Defendants' policy, custom, practice, and order to interrupt and shut down the protest, and to arrest peaceful protestors in the street violated the protestors' and Plaintiffs' First Amendment rights.

160.    Each and every officer that participated in shutting down the protest and that followed the unlawful order violated the protestors' and Plaintiffs' First Amendment rights.

161.    Defendants' actions in shutting down the protest violated Plaintiff's First Amendment rights.

162.    As a result of Defendants' violations, Plaintiffs have been damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### *Violation of United States Constitution, Amendment No. 4, 1*
### *Unlawful Arrest, Retaliatory Arrest*
### *42 U.S.C. § 1983*
### *(Defendants Russo, Bartlett, Croft, McHugh, Stirland, Brimhall, and Taylor)*

163.    Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

164.    The Fourth Amendment provides in relevant part:

The right of the people to be secure in their persons… against unreasonable searches and seizures, shall not be violated….

165.    On August 2, 2020, officers arrested Aaron and Gabe.

166.    Officers did not have a warrant to arrest Aaron and Gabe.

167.    The arrests of Aaron and Gabe were not supported by probable cause.

168.    By arresting Gabe and Aaron without probable cause, Russo, Bartlett, Croft, McHugh, Stirland, Brimhall, Bartlett and Taylor violated the Fourth Amendment.

169.     Defendants issued the order to arrest, and arrested Aaron and Gabe in retaliation against Aaron and Gabe for exercising their First Amendment Rights.

170.     As a result of Defendants' violation of the Fourth Amendment, Plaintiffs have been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
*Violation of United States Constitution, Amendment No. 4*
*Excessive Force*
*42 U.S.C. § 1983*
*(Defendants Russo, Bartlett, Croft, McHugh, Stirland, Brimhall, and Taylor)*

171.     Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

172.     As described above, Russo, Croft, McHugh, Stirland, Brimhall, and Taylor's violent actions against Gabe and Aaron on August 2, 2020 were seizures within the meaning of the Fourth Amendment.

173.     Russo and Bartlett aided and abetted the assaults.

174.     These actions are all objectively unreasonable, and constitute the excessive use of force in violation of the Fourth Amendment.

175.     As a result of officers' violation of the Fourth Amendment, Plaintiffs have been damaged in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
*Violation of United States Constitution, Amendment Nos. 1, 4, 14*
*42 U.S.C. § 1983*
*Supervisory Liability*
*(Russo and Bartlett)*

176.     Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

177.    Russo and Bartlett each directly participated in the violations set forth herein and exercised supervisory authority over the other Defendants.

178.    Defendants' August 2, 2020 order to first interrupt and then arrest the protestors for engaging in protected speech was a violation of the First and Fourth Amendments.

179.    After giving the order, Russo and Bartlett oversaw its implementation, and they participated directly in the interruption of speech, arrests, and violent assaults of Gabe and Aaron.

180.    In addition, Russo watched and supervised his officers interrupt Plaintiff's speech, arrest Gabe and Aaron, and assault Gabe and Aaron.

181.    Russo directed the arrests and actively participated in the restraint of Aaron, including when he applied a chokehold to Aaron.

182.    Russo knew that when he ordered officers to arrest everyone in the street, that his officers would comply with his order.

183.    Russo intended his officers to arrest protestors for engaging in protected speech and he watched his officers carry out violent assaults on Gabe and Aaron not only with deliberate indifference, but with his personal approval and participation.

184.    Russo's order and his actions in supervising and implementing the order caused the violations of Plaintiffs' First and Fourth Amendment rights.

185.    On August 2, 2020, Bartlett directly supervised officers in their interruption of Plaintiffs' protected speech and in the arrests of Plaintiffs for exercising First Amendment rights.

186.    Bartlett interfered with protected speech and caused the unlawful arrests, in violation of Plaintiffs' First and Fourth Amendment rights.

187.     Bartlett knowingly supervised and actively participated in arresting Gabe and Aaron.

188.     Throughout the protest Bartlett actively tried to keep cameras and protestors away from his officers as they assaulted Plaintiffs and others.

189.     During the unlawful arrests and assaults, Bartlett consistently ordered citizens to "*get back!*" so that officers could continue the arrests and assaults.

190.     Bartlett instructed officers to arrest protestors in the street.

191.     Bartlett's direct personal involvement caused the violations of Plaintiffs' First and Fourth Amendment rights as set forth herein.

192.     Bartlett watched and supervised his officers carry out violent assaults on Gabe and Aaron with deliberate indifference.

193.     Bartlett's supervision in implementing the unlawful order caused the violations of Plaintiffs' First and Fourth Amendment rights.

194.     The resulting arrests of Gabe, Aaron and others constituted violations of their First and Fourth Amendment rights.

### FIFTH CLAIM FOR RELIEF
*Denial of Equal Protection, United States Constitutution Amendment No. 14*
*42 U.S.C. § 1983*
*(Defendants Russo, Bartlett, Griffith, Tingey, Co-Conspirators 1-5, City of Cottonwood Heights, John Does I-X)*

195.     Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

196.     When Defendants allow some forms of protected speech but prohibit others, the Equal Protection clause is implicated.

197.    In this case, Defendants violated Plaintiffs' rights to equal protection of the laws by targeting Plaintiffs based on the content of their speech.

198.    This targeting is evident in numerous ways set forth in the complaint.

199.    Defendants shut down the protest for the precise purpose of preventing the James family from speaking in public.

200.    In addition, Defendants allowed counter-protestors advocating a pro-police and anti-protestor viewpoint to walk freely in the streets on August 2, 2020, and allowed these counter-protestors to spew violent threats to Tiffany James, her daughter Raven James, and others.

201.    On August 2, 2020, counter-protestors threatened Tiffany and Raven James and others and walked in the street directly in front of Bartlett and other officers.

202.    This counter-protestor threatened Tiffany and Raven James in full view of officers:



203.    The man in the cowboy hat walked up the street with two other men and shook hands with Officer Bryan Griffith.

204. The man who hid his face in a mask with the cowboy hat called Tiffany and her daughter "*fucking bitches*."

205. The man in the cowboy hat threatened Tiffany: "*I'm going to come back and burn down your house*."

206. These statements were made in full view of Griffith, who was no more than two feet away from the man when he made these threats.

207. When asked for help, Griffith said he did not hear anything.

208. Bartlett was also present and when asked for help, responded that he "*didn't hear anything*."

209. Although the man threatened a violent felony in the presence of officers, he was allowed to do so because of the content of his speech.

210. Officers acted as if they thought the threat of arson was funny.

211. As shown in the photograph, multiple officers looked on with approval.

212. This was only one of many instances where officers observed counter-protestors make threats and walk in the public street, but based on the content of the counter-protestors' speech, they were not arrested.

213. When she was being interviewed by the media, Officer Griffith walked immediately behind the reporter that was interviewing Tiffany James.

214. Officer Griffith made intimidating facial expressions and gestures and handled his shotgun in a manner designed to intimidate Tiffany James and the James family.

215. Officer Grifith's actions demonstrate he was motivated by animus and a desire to suppress speech.

216.    Defendants supported the counter-protestors advocating a Manichean pro-police message, and did nothing to interefere with these protestors' speech, even though they engaged in the very same activity for which the protestors were arrested:  walking in the public street.

217.    Defendants acts of allowing pro-police speech but shutting down Plaintiffs' speech is a violation of the Equal Protection clause.

**SIXTH CLAIM FOR RELIEF**
*Conspiracy to Violate Civil Rights*
*42 U.S.C. § 1983*
*(Defendants Russo, Bartlett, Croft, McHugh, Taylor, Stirland, Brimhall, Tingey, Griffith, Co-Conspirators I-V, City of Cottonwood Heights, John Does I-X)*

218.    Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

219.    Tingey, Russo, Bartlett, Co-Conspirators 1-5, Croft, McHugh, Taylor, Stirland, Brimhall, and John Does 1-10, agreed, conspired, and confederated to violate Plaintiffs' First, Fourth, and Fourteenth Amendment rights as alleged herein.

220.    Tim Tingey, City Manager, consulted with Russo before the protest and approved of the plan to interrupt the protest based on the content of protected speech.

221.    On August 2, 2020, Tingey told Councilwoman Tali Bruce that the City had developed a plan to respond to the protest before August 2, 2020.

222.    Upon information and belief, Tingey also approved of the plan to arrest protestors for exercising First Amendment rights.

223.    Unknown Co-Conspirators 1-5 approved of the plan to prevent the protest based on the content of the protected speech and to arrest protestors for walking in the public street.

224.   The conspirators engaged in concerted action to violate Plaintiffs' First and Fourth Amendment rights.

225.   The conspirators engaged in concerted action to deprive Plaintiffs of the Equal Protection of the laws.

226.   The conspirators did not make any plans to arrest "counter-protestors" found in the public streets and in fact, did not arrest "counter-protestors" found in the public streets.

227.   The conspirators treated the counterprotestors differently based on the content of their speech in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

228.   On August 2, 2020, counter-protestors threatened Tiffany and Raven James and others and walked in the street directly in front of Bartlett and other officers.

229.   This counter-protestor threatened Tiffany and Raven James in full view of officers:



230.   Bartlett and other officers observed counter-protestors make threats and walk in the public street, but based on the content of the counter-protestors' speech, they were not arrested.

231.   The conspirators deprived Plaintiffs of their rights to Equal Protection of the laws and violated Plaintiffs' First and Fourth Amendment rights.

232.   Plaintiffs have been damaged by the conspiracy in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
*Violation of United States Constitution, Amendment Nos. 1, 4, 14*
*42 U.S.C. § 1983*
*(City of Cottonwood Heights)*

233.   Plaintiffs incorporate the previous allegations as if they were set forth completely herein.

234.   Russo was an employee of the City of Cottonwood Heights with final policymaking authority as it relates to the actions of officers under his supervision.

235.   Russo developed and implemented a policy to prevent protestors from walking in the street in violation of Plaintiff's First Amendment rights.

236.   Russo developed and implemented a policy to arrest protestors for being present in a public street during a protest in violation of Plaintiff's First and Fourth Amendment rights.

237.   Russo did not issue his order unilaterally.   Before the protest started, Russo consulted with Tingey,  and upon information and belief, Unknown Co-Conspirators 1-5 regarding a plan to prevent the protestors from marching on public streets.

238.   Russo, Tingey, and upon information and belief, Co-Conspirators 1-5, approved of a plan to interrupt the protest based on the content of protected speech and prevent the protestors from walking on public streets.

239.   Russo, Tingey, and upon information and belief Co-Conspirators 1-5, having approved of the plan to use law enforcement to prevent protestors from walking on public streets, also approved of the plan to arrest protestors found on public streets.

240.    Russo, Bartlett, Tingey, and Co-Conspirators 1-5 approved of a plan and policy to target protestors for their protected speech as outlined herein, while at the same time omitting citizens with a pro-police message from any policy, plan, practice, that prevented a citizen from walking and speaking in the public streets in violation of the Equal Protection Clause.

241.    Defendants' violations of Plaintiffs' federal rights was the highly predictable and plainly obvious consequence of implementing Defendants' policy that interfered with protected speech and mandated arrests of every person found in the street in violation of First and Fourth Amendment rights, while omitting similarly situated persons from equal enforcement of the law, because such persons were not protesting CHPD misconduct or advocated a pro-police message.

242.    The policy developed by Cottonwood Heights through its policy making officials was designed to and had the effect of neutralizing speech critical to the City of Cottonwood Heights.

243.    The development and implementation of policy by Russo, Tingey, and others caused the violations of Plaintiffs' First and Fourth Amendment rights as set forth herein.

244.    In addition to acts by Russo, to the extent the City of Cottonwood Heights had any formal or informal regulation or policy statement that prevented protestors from walking in the street in exercise of their First Amendment rights upon pain of arrest, and to the extent the City of Cottonwood Heights had an informal custom amounting to a widespread practice to prevent protestors from walking in the street in exercise of their First Amendment rights upon pain of arrest, then such policy or practice is in violation of Plaintiffs' First and Fourth Amendment rights, and Defendants' enactment and implementation of such policy violated Plaintiff's First and Fourth Amendment rights.

245.    The City of Cottonwood Heights failed to adequately train or supervise officers, and such failure directly resulted in the violation of Plaintiff's First, Fourth and Fourteenth Amendment rights.

246.    As a result of the City of Cottonwood Heights' violations, Plaintiffs have been damaged in an amount to be determined.

<strong><u>PUNITIVE DAMAGES</u></strong>

Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. §1983 as Defendants' conduct, acts, and omissions alleged herein constitute malicious, wanton, reckless and callous indifference to Plaintiffs' federally protected rights.

<strong><u>JURY DEMAND</u></strong>

Plaintiffs demand a trial by jury of all issues so triable.  Fed. R. Civ. P. 38.

Plaintiffs seek judgment as follows:

1.    Actual damages;

2.    Punitive damages;

3.    Attorney fees and costs as allowed 42 U.S.C. §1988(b);

4.    Expert fees as allowed by 42 U.S.C. §1988(c);

5.    Permanent injunctive relief preventing the City of Cottonwood Heights and Cottonwood Heights police officers from unlawfully interfering with the exercise of First Amendment rights and from violating citizens' rights under the Fourth Amendment; and

\\

6.     For such other equitable relief as is warranted by the circumstances.

DATED: May 20, 2021

_/s/ Sam Meziani_____
Sam Meziani
Seamus W. Appel
*Attorneys for Plaintiffs*